

IN OPEN COURT

FEB - 6 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 1:20-cr-27 |
| | ) |
| ALAA NIMR GARADA, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

The United States and the Defendant, ALAA NIMR GARADA (hereinafter "the Defendant") agree that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. The Defendant and his brother and co-defendant, Rafik Moheyeldin ("Moheyeldin"), owned and operated WTC2, Inc. ("WTC2"), formerly known as World Trade Company, Inc. The Defendant held the title of President and Moheyeldin held the title of Director. WTC2 opened in and around 2004 and operated until in and around 2017. WTC2 had its place of business in Woodbridge, Virginia, which is located within the Eastern District of Virginia.

2. WTC2 purchased and resold used goods, including clothing and shoes. During the relevant time period, WTC2 contracted with charities that operated clothing donation centers. In particular, WTC2 contracted with several charities to setup donation bins with the charities' logos, and WTC2 was then permitted to keep the goods collected in those bins. WTC2 primarily collected used clothing and then resold the clothing. WTC2 sold the used goods in bulk lots to

customers along the U.S.-Mexico border and also exported items to customers in Africa, Asia, and South America.

3. In order for WTC2 to be profitable, the business needed to keep its labor costs low. As a result, the Defendant and Moheyeldin knowingly hired unauthorized aliens who were not permitted to work in the United States, as defined in Title 8, United States Code, Section 1324a(h)(3), and were brought into the United States in violation of Title 8, United States Code, Section 1324(a).

4. From in and around 2012 until in and around 2016, the WTC2 workforce was comprised primarily of unauthorized aliens for whom no payroll taxes were remitted, and no employment benefits, such as unemployment and/or worker's compensation insurance, were available or paid to any eligible beneficiary. WTC2's practice of relying on the labor of unauthorized aliens provided WTC2 with a significant competitive advantage and resulted in substantial financial gains for the Defendant and Moheyeldin. Over the years, WTC2 turned a substantial profit and increased the size of its workforce. In and around 2014, WTC2 employed approximately 50 unauthorized aliens and had a gross income of approximately $8,000,000 a year.

5. From in and around September 2012 until in and around September 2013, and then again from in and around September 2014 until in around September 2015, both at least one year periods, in Woodbridge, Virginia, within the Eastern District of Virginia and elsewhere, the Defendant and Moheyeldin did unlawfully and knowingly hire for employment at least ten individuals with actual knowledge that the individuals were unauthorized aliens who were not permitted to work in the United States as defined in Title 8, United States Code, Section 1324a(h)(3), and were brought into the United States in violation of Title 8, United States Code, Section 1324(a).

6. WTC2's success motivated the Defendant and Moheyeldin to found US Plastic, LLC ("US Plastics") in 2013. US Plastics was operated at the same location as WTC2 and also employed unauthorized aliens. US Plastics collected, sorted, and processed bulk plastic material.

7. The Defendant and Moheyeldin violated various labor laws. In particular, the unauthorized aliens were not properly compensated for the overtime hours they worked. Further, the defendants had not procured adequate workers compensation insurance. When a forklift ran over an employee's foot, the employee received no benefits from the defendants' company or an insurance company.

8. The Defendant and Moheyeldin paid the unauthorized aliens in U.S. currency because it helped conceal that much of their workforce was comprised of unauthorized workers. This in turn helped the Defendant and Moheyeldin avoid withholding payroll taxes, as required by law. Indeed, from in and around 2011 until in and around 2015, WTC2 and later US Plastics only withheld payroll taxes for one employee — the Defendant's wife. As a result, the profits earned by WTC2 were greater than they would have been if WTC2 hired persons who were lawfully able to work in the United States.

9. Also, during this time, the Defendant falsified tax returns in an effort to hide the fact WTC2 largely employed unauthorized aliens. Specifically, from 2013-2016, WTC2 employed at least 50 unauthorized aliens. Despite this fact, the Defendant falsely stated in multiple Employer's Quarterly Federal Tax Return, Form 941s, that WTC2 employed one employee. The size of WTC2's workforce claimed on the Employer's Quarterly Federal Tax Return, Form 941, is a material matter.

10. For instance, on or about May 29, 2015, in Woodbridge, Virginia, within the Eastern District of Virginia and elsewhere, the Defendant willfully made and subscribed an Employer's Quarterly Federal Tax Return, Form 941, for the first quarter of calendar year 2015,

which was verified by a written declaration that it was made under the penalty of perjury, which the Defendant did not believe to be true and correct as to every material matter. That Form 941, which was filed with the Internal Revenue Service, reported that WTC2 employed one employee (line 1) for the quarter, whereas the Defendant then and there knew WTC2 employed substantially more than one employee for the first quarter of calendar year 2015 than he reported. The estimated tax loss for this quarterly filing is $1,500.

11. Based on the above facts and other information, the United States obtained a lawful seizure warrant for the proceeds associated with the unlawful employment of aliens. This warrant authorized the United States to seize approximately $2,028,163.59 in United States currency from WTC2's Burke & Herbert Bank account. The Defendant has agreed to the forfeiture of this and other proceeds.

12. In addition to employing unauthorized aliens and committing tax fraud, the Defendant also defrauded Goodwill of Greater Washington ("Goodwill") of property. As described above in paragraph 2, Goodwill was one of the charities that WTC2 contracted with to setup donation bins.

13. Goodwill contracts with third parties to establish and service donation bins and attended donation sites bearing Goodwill's name and logo. With authorization from Goodwill and approval from property owners where the collection bins will be located, the third parties are permitted to place donation bins and attended donation sites bearing Goodwill's name and logo, and are responsible for collection of the donated goods and maintenance of the sites. Portions of the donations are supplied to Goodwill's retail stores, and the remaining goods become the property of the third party.

14. On or about March 23, 2012, the Defendant signed a contract on behalf of "World Trade" with Goodwill. Under this contract, Goodwill granted World Trade the right to act as a

salvage dealer at four of Goodwill's retail stores, which were located in the Eastern District of Virginia and elsewhere. Goodwill also granted World Trade the right to place donation bins bearing Goodwill's name and logo.

15. After entering into this agreement, the Defendant and Moheyeldin knowingly devised a scheme to defraud Goodwill. Specifically, the Defendant instructed WTC2 employees to retrieve Goodwill donation bins. WTC2 took possession of the donated items in the bins; though, under the contract, World Trade was not entitled to keep all of the donated goods if Goodwill retail stores needed some portion of them (up to 25 percent). The Defendant instructed WTC2 employees to remove Goodwill's logo and replace it with the Military Family Support Center's logo. WTC2 used the Military Family Support Center's logo without permission. The Defendant then instructed WTC2 employees to place these bins at various locations in the Eastern District of Virginia.

16. After entering into this fraudulent scheme, the Defendant executed two addendum contracts with Goodwill. When the Defendant executed these addendum contracts, the Defendant was aware that he knowingly intended to defraud Goodwill of property through the scheme outlined in paragraph 15. This scheme was fraudulent and violated the terms of the contract, because WTC2 failed to verify whether Goodwill in fact needed any portion of the donations prior to keeping the entire amount, and removed Goodwill's logo from Goodwill donation bins without Goodwill's permission.

17. On or about February 13, 2015, in Woodbridge, Virginia, within the Eastern District of Virginia and elsewhere, the Defendant, having knowingly devised and intending to devise a scheme and artifice to defraud Goodwill, and to obtain property from Goodwill, by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause and

attempt to cause to be transmitted by means of wire communication, in interstate commerce, any writings, signs, signals, pictures, and sounds, that is, the Defendant sent and caused to be sent from the Eastern District of Virginia to another state and the District of Columbia, an email with an attachment containing the executed Second Addendum to Salvage Agreement with Goodwill.

18. The acts taken by the Defendant in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law, and were not committed by mistake, accident or other innocent reason.

19. The foregoing statement of facts does not describe all of the Defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the Defendant may have engaged in illegal activities.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____
Carina A. Cuellar
Assistant United States Attorney

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the plea agreement entered into this day between the Defendant, Alaa Nimr Garada, and the United States, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 2/6/2020

_____
Alan Nimr Garada
Defendant

<u>Defense Counsel Signature</u>: I am counsel for the Defendant in this case. I have carefully reviewed the above statement of facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 2/6/20

_____
Cary Citronberg, Esq.
Counsel for the Defendant

7