IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:20-cr-27 |
| | ) | |
| v. | ) | Hon. Anthony J. Trenga |
| | ) | |
| ALAA NIMR GARADA, | ) | Sentencing Date: April 15, 2021 |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES**
**WITH RESPECT TO SENTENCING**

The defendant, Alaa Nimr Garada (the "defendant"), comes before the Court for

sentencing after pleading guilty to a four-count criminal information, which charged him with

unlawfully employing ten or more unauthorized aliens, a wire fraud scheme in which he

defrauded the Goodwill of Greater Washington ("Goodwill"), and tax fraud.

The United States has reviewed the Presentence Investigation Report prepared in this

case and has no objections.   The United States agrees with the Probation Office that the

properly calculated guideline range is 37 to 46 months.   For the reasons set forth below, the

United States believes that a downward variance is appropriate in this case and asks this Court to

impose a sentence of 18 months of home confinement.

I.    Factual and Procedural Background

In his latest case in the Eastern District of Virginia, the defendant stands convicted of

immigration fraud, wire fraud, and tax fraud.   Put simply, the defendant used and abused

undocumented workers so he and his family could make a handsome profit.   Then, incredibly,

the defendant decided to replace the Goodwill's branding from charity boxes with the Military

Family Support Center's logo, all without the permission from either charity, so he could profit

from the resulting donations.    And, then, as if that were not enough, the defendant filed a false

tax return.    Needless to say, the defendant was busy between all his frauds.

    A.    <u>The Defendant's Employment of Undocumented Workers</u>

In and around 2004, the defendant and his brother and co-defendant, Rafik Moheyeldin,

founded WTC, Inc. ("WTC2") in Woodbridge, Virginia.[1]    The defendant held the title of

President, while Moheyeldin held the title of Director.    WTC2 specialized in purchasing and

reselling used goods, including clothing, shoes, and other items.

Early on, the defendant and Moheyeldin realized that they needed to contract with local

charities to obtain used clothing and shoes, which WTC2 could then export.    During the

relevant period, WTC2 contracted with charities, such as the Goodwill, to set up donation bins

with the charities' logos around the Washington, D.C. metropolitan area.    Because the Goodwill

and other charities often receive far more donations than they can sell, WTC2 also contracted

with the Goodwill and other charities to keep a portion of the clothing, shoes, and other donated

goods.    WTC2 then packaged and prepared the goods for export.

For WTC2 and other similar businesses to be profitable, labor costs must be kept low.    It

is well-known in this industry that the minimum-wage and other payroll and workplace

protections afforded to American workers are cost-prohibitive and make this industry

unattractive.    Both the defendant and Moheyeldin knew this well, which is why they jointly

decided to employ undocumented workers.

Thus, by 2012, but most certainly even earlier, the defendant and Moheyeldin primarily

---

[1] The company has had at least one name change over the years and was formerly known as the
World Trade Company.

employed unauthorized aliens to work at WTC2.    During this period, the defendants did not pay payroll taxes to Virginia.    Further, the defendants failed to provide any employment benefits, including unemployment and worker's compensation insurance.    As a result, WTC2 had a significant competitive advantage and returned a handsome profit to the defendants.    Over the years, WTC2's profits grew exponentially.    For instance, in and around 2014, WTC2 employed approximately 50 unauthorized aliens and had a gross income of approximately $8,000,0000 a year.    Moreover, based on the defendant's tax returns, it is estimated that WTC2 earned at least an estimated 30 million in gross income between 2012 and 2016.

Further, during this same period, the defendants structured their financial transactions to repeatedly withdraw just short of $10,000 from WTC2's Burke & Herbert Bank account.    The defendants structured the transactions in this way to avoid reporting requirements.    The defendants also chose to pay their undocumented workers in cash because they did not want government authorities to notice that they were failing to make the necessary contributions to both the federal and state government.

### a.   *The defendants mistreated their workers*

Unfortunately, there was also a dark side to the defendants' employment of undocumented workers.    To a person, most of the undocumented workers were from Central America and occupied the lowest income rung in our society.    Further, many of the workers possessed limited English proficiency and had no one to turn to for protection or recourse when they were injured or mistreated at work.    The defendant and Moheyeldin knew this well.    As a result, WTC2 maintained an unsafe work environment and repeatedly failed to provide for injured workers.    Further, Moheyeldin mistreated many of the workers on several occasions

when he threw glass and other objects at the workers.

After federal law enforcement searched the WTC2 warehouse in early September 2015, law enforcement spoke to many of these undocumented workers.    In both their statements and in grand jury testimony, these workers told the same chilling stories.    First, they detailed how much the defendants took advantage of their undocumented status.    For instance, the employees often worked 10 to 11 hours a day from Monday to Saturday; though, the workers were never paid for their overtime.    The defendants also paid the workers in cash and failed to provide paystubs or deduct income tax from their pay.

Many of the workers also described an unsafe workplace where they were repeatedly subjected to verbal and sometimes physical abuse.    Further, over the years, many of the workers suffered injuries.    For instance, one employee was injured when Moheyeldin used a forklift to lift him while he was inside a box.    While the employee does not know whether Moheyeldin's actions were deliberate, the employee fell to the ground and hit his head when the box shifted. The employee suffered from blurry vision and sought medical treatment.    Other employees suffered lacerations to their arms, eyes, and other body parts from glass.    Further, on one occasion, Moheyeldin threw glass at an employee, drawing blood.    In addition, another employee suffered a serious injury after a forklift operator ran over his foot.

Injured employees were largely met with antipathy.    The defendants expressed little concern for their well-being and on most occasions failed to pay for medical expenses and other bills.    Moreover, the defendants failed to take measures to improve workplace safety after these injuries were sustained.

*b.   The defendants continued to operate WTC2 after it was shut down*

Nor are the workers the only evidence that WTC2 maintained an unsafe work environment.    To the contrary, in May 2016, the Prince William County Fire Marshal's Office shut down WTC2's warehouse after finding the structure unsafe.    Despite this notice, however, the defendants continued to operate WTC2 at night.    Moreover, even after federal law enforcement executed search warrants and seized approximately two million dollars in assets, the defendants continued to mainly employ undocumented workers.    For a sustained period, the defendants directed their undocumented workers to only work during the evenings and conceal their arrivals and departures.    Both Virginia and federal authorities, observed the defendants violate the Fire Marshal's order on multiple occasions.    Further, the undocumented workers, who were now cooperating with law enforcement, also called to inform authorities.    The defendants continued to engage in this behavior as late as February 2017.

Finally, the defendants closed WTC2 in late 2017.    Despite the federal government seizing through civil forfeiture approximately $2,028,163.59 in illegal proceeds, the defendants still possessed millions more.    During 2017, the defendants used at least part of this money to purchase 34 residences in Baltimore.    However, because the defendants set up an LLC to purchase these properties and their purchases were less than transparent, law enforcement only discovered the defendant's purchases after some time passed and by happenstance.    Thankfully, law enforcement's discovery ensured that the United States was able to obtain an additional 1.9 million dollars in forfeiture from the defendants.

 B.    <u>The Scheme to Defraud the Goodwill</u>

The defendant is no stranger to committing fraud.    But in 2015, the defendant sunk to a

5

new low when he and Moheyeldin decided to defraud the Goodwill.    During this time, the

Goodwill contracted with WTC2 to establish and service donation bins and serve as the salvage

dealer at four of the Goodwill's retail stores.    This contact also granted WTC2 the right to place

donation bins bearing the Goodwill's name and logo.    Here, the wire fraud charge stems not

from the defendant and Moheyeldin's failure to execute WTC2's contract with the Goodwill,

which was the subject of a civil lawsuit in this District, but from a scheme to defraud the

Goodwill of donations.

　　　More specifically, despite signing a contract with the Goodwill, the defendant and

Moheyeldin instructed their employees to retrieve the Goodwill donation bins; though, WTC2

was not entitled to keep all the donated goods.    Then, incredibly, the defendant and Moheyeldin

instructed workers to remove the Goodwill's logo and replace it with the Military Family

Support Center's logo.    WTC2 used the Military Family Support Center's logo without

permission.    The defendants then instructed WTC2 employees to place these bins at various

locations around the district.    This scheme continued for some time and resulted in the

Goodwill losing a considerable amount of money.    Further, the defendant executed two

addendum contracts with the Goodwill; though, they both knew that they intended to defraud the

Goodwill of donations.

　　　C.　　The Defendant's Submission of a False Tax Return

　　　Finally, on top of immigration fraud and defrauding the Goodwill, the defendant also

committed tax fraud.    At bottom, the defendant wanted to make as much money as possible and

pay as little tax as possible.    To this end, the defendant not only employed undocumented

workers to maximize his profits but also filed false tax returns to conceal this fact.    Specifically,

from 2013-2016, WTC2 employed at least 50 unauthorized aliens.   Despite this fact, the defendant falsely stated in multiple Employer's Quarterly Federal Tax Return, Form 941s, that WTC2 employed one employee, his wife.   As a result, he was able to conceal his fraud and pay less in taxes.

II.     Analysis of Sentencing Factors

In addition to the properly calculated guideline range, this Court is also required to consider the sentencing factors identified in 18 U.S.C. § 3353(a).   Those factors weigh in favor of imposing a sentence of 18 months of home confinement.

A.     The Defendant's Actions Harmed his Workers and the Goodwill

First, the defendant through his actions harmed his undocumented workers and the Goodwill.   The defendant's desire to make as much money as possible drove him to employ undocumented workers, who for the most part did not speak English and had no one to turn to for protection.   Then, over the course of several years, the defendant and Moheyeldin exploited the workers and maintained an unsafe work environment, which resulted in countless employees suffering injuries over the years, some serious.   The defendants exploited these workers in countless ways including, but not limited to, failing to (1) pay the workers minimum wage; (2) pay workers for the overtime hours they worked; (3) provide pay stubs; and (4) withhold payroll taxes.

Most importantly, the defendant and Moheyeldin also abused the workers.   Both the defendant and his brother should have been content with requiring workers to work overtime without compensation, but this was not enough.   In addition, workers were forced to work in unsafe conditions and repeatedly suffered injuries, some of which were quite serious.   Despite

7

these injuries, which piled up over the years, no steps were taken to improve workplace safety. There is no doubt that the defendants were able to get away with this conduct because they employed undocumented aliens who had little recourse.

In addition, the defendant and his brother also had the audacity to defraud the Goodwill and misuse a military charity's logo.   Through their actions, the defendant and Moheyeldin defrauded the Goodwill of a considerable amount of money.   But that is not all.   The defendant and Moheyeldin also convinced members of the public that they were donating to a military charity, when, in fact, those donations lined the defendant and Moheyeldin's pockets. This pattern of criminal conduct reflects that the defendant would do almost anything and defraud almost anyone to make a profit.

It is therefore imperative that the defendant's sentence reflect the seriousness of his longstanding fraudulent activity.

B.     The Defendant's Sentence Must Specifically Deter Him from Committing Further Crimes

Second, and it goes without saying, that this defendant's sentence must specifically deter him from committing future fraudulent activity.   This is now the third time that the defendant stands before a court in the Eastern District of Virginia for sentencing.   And, while his previous convictions are now approximately 20 years old, this fraudulent conduct also began years ago. Moreover, all the convictions reflect an individual who is driven to earn money through fraudulent activity.   Quite frankly, at this point, it is difficult to believe that this defendant is willing to *legally* earn money.

Moreover, the defendant took part in a long-standing fraud over a sustained period. Further, the defendant continued to mainly employ undocumented workers even after federal

8

authorities executed multiple search warrants and seized over two million dollars in assets.   The defendant and his brother then purchased 34 properties in Baltimore with illegal proceeds in a less than transparent way.   Thankfully, the United States discovered these purchases and was able to collect the additional 1.9 million dollars in forfeiture.

The defendant's actions show that the defendant was committed to his fraudulent conduct for a sustained period.   For this reason, the Court's sentence must send a message to this defendant that this must be his last federal conviction.

C.   <u>The Sentence Must Deter Others from Unfairly Taking Advantage of Undocumented Workers</u>

Third, and it goes without saying, that this defendant's sentence must deter other employers from taking advantage of and abusing undocumented workers.   The defendant and Moheyeldin are not unique in their desire to earn a profit and enrich themselves.   Thus, there will always be some individuals — especially, those who are operating businesses with marginal returns — who exploit undocumented workers.   This case, however, is a prime example of how undocumented workers are harmed by such a practice.   Unfortunately, too many workers are forced to work long hours in unsafe conditions without proper compensation and deprived of their lawful benefits.   It is therefore important that this Court's sentence send a message that the law protects the weakest among us.

D.   <u>Taking All the Sentencing Factors Together a Sentence of 18 months of Home Confinement is Appropriate</u>

This is a serious case, which is why the Sentencing Guidelines call for a sentence within a range of 37 to 46 months.   And, the United States has a responsibility to both the community and the defendant to evaluate the factors articulated in 18 U.S.C. § 3553(a) when it recommends

9

a sentence to this Court.   The above discussion sets forth why the defendant's conduct harmed the community and the need for specific and general deterrence; however, it is also important to consider the defendant's characteristics and the efforts he has made to make the victims whole in this case and to forfeit his illegal proceeds.   When considering all these factors — in particular, the defendant's poor health and his efforts to satisfy his forfeiture and restitution requirements — the United States submits that a sentence of 18 months of home confinement strikes the appropriate balance.

As described in detail in the Presentence Investigation Report, the defendant is in particularly poor health after suffering a heart attack and undergoing bypass surgery and aortic valve replacement.   The United States has also met with the defendant on several occasions and it is apparent that he is in poor health and suffering from some type of memory loss.   As a result of these conditions, the defendant is prescribed several medications and vitamins for his health. Thus, even in the best of times, the defendant's poor health would be a cause for concern when ordering confinement to the Bureau of Prisons.   But these are not the best of times.   To the contrary, the Coronavirus 2019 ("COVID-19") pandemic has proven persistent and unpredictable, and the United States agrees there is a real concern that the defendant's health could be put at risk should he be confined.[2]

---

[2] The United States understands that the defendant intends to argue that should this Court order the defendant to serve any time in the Bureau of Prisons then the Department of Homeland Security ("DHS") will be mandatorily required to take the defendant into custody pursuant to INA § 236(c).   Undersigned counsel has obtained legal advice from U.S. Immigration and Customs Enforcement ("ICE") and can represent that this is not the case.   First, whether the defendant serves a custodial sentence or not, he is still subject to the mandatory detention language in INA § 236(c).   Second, neither DHS nor the Board of Immigration Appeals ("BIA") interpret the mandatory language as *requiring* DHS to detain a non-citizen like Garada.   BIA explained in *Matter of E-R-M- & L-R-M* that the term "shall" as used in INA § 235(b)(1)(A)(i)

Moreover, it is important to evaluate how the defendant has responded since he pleaded guilty.   We can represent to the Court that the defendant and Moheyeldin have paid in full the additional sum of $1.9 million in forfeiture.    Further, as outlined by the Goodwill, the defendant and Moheyeldin have also made the Goodwill whole by paying restitution.    Finally, the defendant and Moheyeldin have also offered to pay workers who were injured for any expenses they incurred.    The United States believes that at least one such worker is still present in the United States and that the defendant and Moheyeldin will provide compensation to this worker prior to sentencing.

When considering the defendant's age, poor health, the risks posed by COVID-19 to this particular defendant's heath, and his efforts to make the victims whole and forfeit criminally derived proceeds, the United States submits that a term of 18 months of incarceration is sufficient but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2).

III.    <u>Conclusion</u>

The United States understands that it has a responsibility to both the community and the defendant.    The defendant through his actions ran a corrupt business that took advantage of undocumented workers.    He had the audacity to defraud the Goodwill and committed tax fraud. Moreover, this is now the defendant's third federal conviction for fraudulent activity in the

---

means "may" when read in the context of other provisions of the Act and "the broad discretion given to the Executive Branch."   25 I&N Dec. 520.   Though the Board's case considered another statute, it is pertinent here, as the Department also interprets the "shall" in section 236(c) to mean "may" and given its broad discretion can decide whether to hold someone subject to § 236(c) in custody or release.   Undersigned counsel has a more fulsome legal opinion and can explain this opinion at sentencing should it be critical to the Court's decision.

Eastern District of Virginia.    Nevertheless, the United States has a duty to strike a balance

between the harm caused and the defendant's welfare.    In an effort to strike this balance, the

United States recognizes that the defendant is in poor health, that the pandemic presents

extraordinary circumstances, and that the defendant would be at risk if placed in the Bureau of

Prisons.

Ultimately, it is the Court that is entrusted with determining the appropriate sentence.

Considering the seriousness of the defendant's misconduct but also his attempts to make the

victims whole and forfeit criminally derived proceeds, a term of 18 months of home confinement

is appropriate.    Such a sentence would account for the harm to the workers, punish the

defendant for the myriad of frauds that he has committed, and send a message to other employers

that they cannot exploit undocumented workers without serious consequences.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:    _____/s/_____
Carina A. Cuellar
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:   (703) 299-3700
Fax:       (703) 299-3980
E-mail:   carina.cuellar@usdoj.gov