**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:20-CR-27 (AJT)** |
| **ALAA NIMR GARADA,** | ) | |
| | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

**ALAA GARADA'S MEMORANDUM IN AID OF SENTENCING**

Alaa (Alan) Garada is a 59-year-old Palestinian refugee with serious health issues who has lived and worked in the United States for nearly 40 years. He faces deportation and serious illness—or even death—if sent to prison. For those reasons, as well as others set forth below, the defense respectfully requests—jointly with the government—a sentence of home confinement for eighteen months, under whatever conditions the Court deems appropriate.

Mr. Garada committed serious offenses in operating his business, *to wit*: employment of unauthorized aliens and fraud. He deeply regrets them. On April 7, 2021, he will stand before this Court for sentencing.

Sentencing Mr. Garada, a 59-year-old man with heart disease, to prison during the covid-19 pandemic—which, in turn, almost certainly will result in his being detained by ICE and placed in deportation proceedings—would exceed what is necessary. It would be disproportionate to his conduct in this case—conduct that was nonviolent and driven by a well-intentioned but misguided desire to keep his business operational and support his family, including extended family members who were fleeing violence in Egypt and arriving in the United States with no place to live or means of earning a living. It would also be disparate compared to the noncustodial sentences others with

similar health conditions are receiving in light of the covid-19 pandemic; indeed, if Mr. Garada is sentenced to prison, the parties will end up in Court almost immediately after that to litigate a compassionate release request.  And it would risk Mr. Garada being deported and never permitted to return to the United States, where his wife, two children (both of whom are U.S. citizens), and many other family members reside.  It would also mean that he will be detained in an ICE facility—where covid-19, which he is especially susceptible to, is rampant—while he fights his deportation in U.S. immigration court.

Mr. Garada founded a legitimate, successful business that partnered with charities like Goodwill Industries Inc. ("Goodwill").  Goodwill—the victim of the wire fraud offense Mr. Garada has pled to—has submitted a letter confirming that Mr. Garada was a good business partner who provided valuable services for most if not all of their partnership.  But he cut corners that he should not have to make that business more successful.  Most seriously, Mr. Garada did not take sufficient steps to maintain workplace safety for those he employed, and he did not sufficiently compensate his workers when mishaps occurred.

A non-custodial sentence is a just sentence here—especially in light of Mr. Garada's serious health issues and his immigration status.  A sentence of probation with extended home confinement is a just sentence in this case.

## I.    Mr. Garada's Background

Mr. Garada is a Palestinian refugee and an orphan who has lived in the United States for nearly his entire adult life.  He arrived in the United States in 1982.  He has had a green card (i.e., legal permanent residency status) for the past 30 years.

For much of his time in the United States, Mr. Garada has worked to support himself; his wife, Rim El Naka; and his two children, both of whom attend college in Virginia; and a number

of his extended family members for most of the time he has lived in the United States.  He attended Northeastern University, but he ultimately was forced to leave school because he needed to work and support himself and others in his family.  And for nearly thirty-five years, he has done that by founding and running several different businesses, primarily in the Washington, D.C. metropolitan area.

Mr. Garada also has suffered from serious heart problems for years.  He had open-heart surgery in December 2016, after he suffered a heart attack.[1]  *See* PSR ¶ 126; Encl. 1 (Dr. Laurance Kam Letter) ("Dr. Kam Letter"); Encl. 2 (Dr. Kam Records).  He has to see his cardiologist at least every six months to monitor his condition.  His cardiologist has diagnosed him with hyperlipidemia and coronary atherosclerosis (also known as coronary artery disease).  He is on numerous medications to treat both conditions and reduce his risk of a future heart attack or stroke.

A.    **Mr. Garada's Company, WTC2, and Its Important Services for Goodwill**

WTC2, Inc., was located in Woodbridge, Virginia, and operated from approximately 2004 to 2016.  The company dealt in salvage goods.  When people donate goods, often those goods are really just garbage—for example, clothing that is torn and soiled beyond repair, broken glass, and rotting cardboard.  As a result, many entities that collect donations for resale—such as Goodwill— either have to pay their own employees to sort and remove trash from the donations or hire a third party to handle it.[2]  WTC2 was one of those parties, and it made a profit by reselling at least a portion of the salvage goods that it collected.

---

[1] He was hospitalized briefly again after the surgery in January 2017 after experiencing blurred vision and dizziness.

[2] *See, e.g.,* Elizabeth Cline, *Where Does Discarded Clothing Go?*, The Atlantic (July 18, 2014), https://www.theatlantic.com/business/archive/2014/07/where-does-discarded-clothing-go/374613/ ("[C]harities such as Goodwill and the Salvation Army sell only what they can in their retail shops—typically less than 20 percent of what they receive. From there, they call for-profit

In 2012, Goodwill selected WTC2 as a designated salvage dealer for donations it received in northern Virginia. *See* Complaint, Dkt. No. 1, *Davis Memorial Goodwill Industries v. Garada*, 17-cv-347 (E.D.Va. filed Mar. 24, 2017). While WTC2 was fully operational, that partnership was very successful. And the Court need not take Mr. Garada's word for that: Goodwill has provided a letter explaining to the Court the tremendous value of the services that Mr. Garada provided Goodwill during this partnership:

> …WTC2 performed **critical** salvage-good collection and remove services for Goodwill in the District of Columbia, Virginia, and Maryland. In fact, for much of that time period, WTC2 was Goodwill's exclusive salvage-goods collector in the Washington, D.C. metropolitan area. Goodwill estimates that during that almost 10-year relationship, Mr. Garada's company paid a total of what is estimated to be over ***$10,000,000*** in revenue for the salvage goods that he purchased from Goodwill. A portion of those proceeds helped to fund the mission of Goodwill.

Goodwill Letter at 1 (emphasis added); *see also* Goodwill Civil Compl. ¶¶ 21-22, 27; Compl. Exhibits 2, 3 (confirming multiple extensions and geographic expansions of contracts between Goodwill and Mr. Garada between 2007-16).

### B. The Offense Conduct

Mr. Garada pled guilty to two counts of unlawful employment of one or more unauthorized aliens (8 U.S.C. § 1324) (Plea Agreement ¶ 1), and one count of wire fraud in connection with his

---

textile recycling companies . . . who then buy up the leftover clothes by the pound and recycle them."); Brennon Gurley, *East Texas Thrift Stores Struggle with Dumping of Trash*, KLTV.com (Mar. 22, 2019) ("[T]hrift stores end up spending time and money to dispose of the unusable junk rather than their ultimate goal which is to raise money to help people in need by selling donated items[.]"), https://www.kltv.com/2019/03/22/east-texas-thrift-stores-struggle-with-dumping-trash/; Stephanie Ingersoll, *Charities Don't Want Your Trash, Unmatched Shoes or Rotten Food*, Clarksville Leaf-Chronicle (Dec. 7, 2018), https://www.theleafchronicle.com/story/news/local/clarksville/2018/12/07/thrift-stores-goodwill-donations-mingled-trash/2227412002/.

business dealings with Goodwill, the factual basis for which was convoluted at best.  18 U.S.C. §

1343; Plea Agreement ¶ 1; Statement of Facts ¶¶ 9-10, 14-16.[3]

### 1.    *Employment of Undocumented Workers*

WTC2's business depended heavily on manual and industrial labor.  As noted above,

people dumping trash at donation sites and in donation bins is a major challenge for Goodwill and

other charities.  WTC2 needed workers to (1) drive trucks in the northern Virginia area to collect

excess goods from Goodwill's stores and the donations from the bins in the DMV area; (2) sort

through the donations to remove any unsalable ones; and (3) package the salable goods for resale

to third parties, which generally involved operating heavy machinery to package them into bales

for resale.

Many of the workers WTC2 found to meet those needs were not authorized to work in the

United States.  The type of jobs that WTC2 could offer—manual, low-skill labor that was available

on a near-steady basis and for which wages could be paid in cash—attracted workers who had

relatively limited employment opportunities, including workers who were undocumented.  WTC2

also was a small, relatively unsophisticated company, so there was no formal hiring process in

place.  Workers simply would refer friends or family members who needed a job to Mr. Garada or

one of his brothers, and Mr. Garada or one of his brothers would decide whether to hire that person.

The manual work that WTC2 required of its employees—which regularly involved sorting

through waste materials and operating industrial equipment—sometimes resulted in workplace

injuries.  One employee, whose foot was injured in an accident with a forklift, did not receive

---

[3] As noted above, Mr. Garada also pled guilty to one count of tax fraud based on WTC's tax returns, which falsely stated that the company employed only one person (26 U.S.C. § 7206(1)). Mr. Garada has agreed to pay the IRS $6,000.00 in tax losses, which the parties agreed represents the amount of tax loss that resulted from the offense conduct.

medical benefits from WTC2 or from an insurance carrier.  Plea SOF ¶ 7.  WTC2 also did not obtain adequate workers' compensation insurance.  *Id.*

### (1)    *Failure to Perform Under Goodwill Contract*

WTC2 also ultimately failed to perform on certain of its obligations under its contract with Goodwill, which formed the basis for a plea to one count of wire fraud of Goodwill.  Goodwill has stated in a letter to the Court that Mr. Garada's offense "does not undo all of the invaluable and important work that Mr. Garada and WTC2 did perform for Goodwill for almost 10 years before that."  *See* Goodwill Letter.

WTC2 took possession of all of the goods that it collected for Goodwill.  Although the contract gave Goodwill the right to up to 25 percent of the goods that WTC2 collected "should the need for additional donations arise," it did not specify whether Goodwill was obligated to notify WTC2 if it needed more donations, or if WTC2 had the affirmative obligation to consult with Goodwill about that.  For his part, Mr. Garada never verified with Goodwill whether WTC2 was entitled to keep of all the goods that it had collected from the WTC2 bins that had Goodwill's logo, or if Goodwill needed any portion of those goods back.  But as long as Goodwill continued to renew its contract with WTC2 between 2012 and 2015—and never requested any portion of the donations back—Mr. Garada did not believe that he needed to verify with Goodwill whether Goodwill wanted those donations back.  WTC2 also removed Goodwill's logo from certain bins—without Goodwill's permission—and replaced them with the logo of another entity.

III.     **A Sentence of Home Confinement Is a Just Sentence**

A.     **The Section 3353(a) Factors Weigh in Favor of a Non-Custodial Sentence**

1.     History and Characteristics of Mr. Garada

Mr. Garada's life, to a point, has been a modern-day Horatio Alger story.  He was born a Palestinian refugee in Egypt in 1962, the youngest of twelve children, three of whom live in the northern Virginia area.  The Egyptian government refuses to recognize Palestinian refugees as citizens, so he literally is a man without a country.  His parents fled to Egypt in or around 1948; his father also was a self-made man who had built an import-export business in Egypt before he died of a heart attack in 1962, when Mr. Garada was only about four years old.  His mother also died of a heart attack in 1969, leaving Mr. Garada an orphan when he was only seven.

Mr. Garada spent much of his childhood—starting when he was about three years old—in military boarding schools in Egypt and Syria.  He was denied admission to the universities in the Middle East that he applied to, because of his Palestinian refugee status.[4]  When he was admitted to Northeastern University in Boston, he immigrated to the United States in 1982—at the age of twenty—and he has lived in this country since.

In the nearly forty years that he has lived in the United States, Mr. Garada has worked hard and started a number of businesses, most recently in real estate.  Goodwill has described at length the legitimate work that WTC2 did for Goodwill.

---

[4]  *See also* Human Rights Watch, "Treatment and Rights in Arab Host States," https://www.hrw.org/legacy/campaigns/israel/return/arab-rtr.htm#ft5 (noting that "Palestinian students were, until 1978, 'treated like the Egyptians who received free education in schools, universities and institutes.' Then the government gradually began to impose hard currency tuition fees for Palestinians, treating them as foreigners, and 'banned Palestinian students from joining colleges of medicine, pharmacy, economics, political science, and journalism.'(5)") (quoting Abdul Khader Yassin, "The Palestinians in Egypt," Shaml, 1996.);

Mr. Garada supports not only himself, but also his immediate family, and many in his large extended family.  At least two of his sisters depend on him for financial support.  Mr. Garada has worked tirelessly for many years to make enough money to provide for all of the people depending on him.  Before he was forced to undergo open-heart surgery in 2016, his wife recalls that he was working 16-hour days.

### a.   Mr. Garada's Open-Heart Surgery in 2016 and Recovery

Mr. Garada's long family history of heart disease—and likely his years of overwork— unfortunately caught up with him in 2016, when he had to have open-heart surgery.  His wife, Reem, has written about the toll this took on Mr. Garada and his family, and the strength and grace that Mr. Garada has shown in coping with his health problems and reevaluating his life and priorities to stay healthy and be there for his family:

> It was extremely shocking as you wake one day and find out that your love is in danger and he has to immediately go through a complicated surgery. The doctors rushed him to operate[,] telling us that there is no other solution or choice. Myself, family, friends, and even people who knew him but never met him, prayed day and night that he would go through his operation. The surgeon told me that Alaa had a heart attack once they started the anesthesia and that they frantically had to call for more surgeons to help his heart to come back and continue the surgery.

> . . . As much as we are thankful that this operation brought him back to us, it had a big toll on [Alaa].  . . . He has to change his lifestyle, diet, and work. He can't continue to work up to 16 hours every day; he can't do any strenuous or stressful work like the one he had; he can't be active for a long time like he used to be. . . The first three years were very hard. Not only he lost his business that he can't manage anymore, also a lot of people and even family members started to avoid him and turn their backs on him thinking that he is sick, broke, and can't be useful as before.

> . . . Thank God with his good faith and willingness, he turned things around for the better. He changed his business to real-estate management, a less demanding and less stressful job. Also, under continuous medical supervision he has gotten back to a more active life. He was able to go to the gym with his kids, spend more time with them, and accept gracefully a more semi-retirement life. Also, people's reaction didn't stop him from overcoming their attitude and keep helping them knowing fully that it is his duty to help people no matter their beliefs or what actions they've done.

Mr. Garada has to see his cardiologist at least every six months to monitor his condition. His cardiologist has diagnosed him with hyperlipidemia and coronary atherosclerosis (also known as coronary artery disease). He is on numerous medications to treat both conditions and reduce his risk of a future heart attack or stroke.

### b.  Mr. Garada's Immigration Status

Alaa Garada is a native of Palestine born in Egypt to Gazan refugees. He does not possess Egyptian citizenship or the citizenship of any other country. The United States is his only country of residence; he has not resided anywhere else for roughly 40 years. Under 8 U.S.C. § 1227(a)(2)(A)(ii), he appears deportable for having more than two convictions for crimes involving moral turpitude.

### c.  Mr. Garada as a Husband and Father

Mr. Garada's family members have submitted letters attesting to the important role he plays in their lives and how much they depend on him. He has given his children the love and the support that he did not have growing up as an orphan in and out of boarding schools:

- Hana, his daughter, a freshman at Virginia Commonwealth University in Richmond:

"I think of him as not only a father but as my best friend. Alaa is one of a kind. He is always by my side whenever I need him. Whether it's grilling a barbeque for my friends, helping me prepare for my [driver's] license, or giving me advice when I'm stressing out about school. Alaa has always been around to offer me a helping hand . . . . Alaa is unique and brings light into any room he steps into. His cheerful and energetic personality can make anyone's day a hundred times better."

- Mohammed, his son, a student at Virginia Tech University:

His father's "wisdom and kindness are unmatched by anyone I have seen. . . .
The experience and his life story he lived is definitely something to be admired as it's as eventful as a movie when broken down. Despite his hard upbringing he's one of the most generous people I know. He is known within the family to be the main support for many people; he helps and provides assistance for many people not only within our family but close friends as well.

"He practices a viewpoint [of Islam] where the main focus isn't just the worship of God but to be kind and to help your community and give back. There isn't anyone I know personally that practices those parts of Islam better than my father does"

- Reem, his wife of 22 years:

"[A]fter twenty-two years of marriage, he is the nicest and kindest person I have ever met. His kindness extends not only to his wife and kids but extends to the rest of his bigger family, friends and even strangers he doesn't know. His faith, good heart, people's love and determination helped him to go through the most strenuous times in our life. He puts his family on the top of his priorities, spare no time or means to support, assist and care for them. . . . . He fills the house with laughter and positive energy. . . .  He also has a very kind heart that is the backbone to many people in his family. For years, he was committed to pay college tuition to nearly a dozen of his nieces and nephews in Egypt, Saudi Arabia, Jordan and the US. He also, since more than ten years, financially supports two of his widowed sisters who have no source of income or medical coverage, despite any financial hardship he goes through. Furthermore, Alaa has generously financially and emotionally supported my sister during her dental study the last eight years. He treats her as his own daughter giving her all his financial support, care and advice. He used to work with non-profit organizations like GOODWILL and Salvation Army through which he met a lot of people in need. Besides family and friends, Alaa helped and still supports a lot of families of broken homes and widows through monthly payment to help pay their rent and monthly payments. He always makes sure to offer his help, financially or emotionally, whenever it is right to offer it without judging people of who or what they are. His kind heart which is filled with faith for God makes him so compassionate towards anyone in need if they are in pain or hardship. For example, last year my sister's friend got very ill and she had no one but her sister in another state to care for her. Without knowing or meeting this girl, Alaa visited her a couple of times at the hospital, gave money to her sister, talked with doctors, and pushed the need to be transferred to another hospital with better ICU care. She needed a lung transplant, but sadly this young lady succumbed to her disease and could not keep fighting for her life and died in her twenties. Another incident I remember was when he met a young man who worked for him for a couple of months. Alaa kept sending monthly payments to this young man and his mom for years. That young man told Alaa that he had established his business and fully supported his mother and siblings and would not be able to do that without the monthly payments he kept sending them despite that he didn't work for Alaa any more.

- Lina, his sister-in-law:

"Alaa would always treat people equally no matter where they come from, their social status, their education or religion. He holds no prejudice and is very tolerant. These characteristics and his charismatic character are the reason why people like to become friends with him. He treats the poor with kindness and helps them, he supports people and young adults who have no one to care for them. He has always been generous with his time and would never let down a friend or family. It has been 21 years since my sister has been married to Alaa. Throughout that period, Alaa has never shown her but respect, love, care, and support. He is the one who encouraged her to continue her graduate studies. She would go to classes at night and he would babysit the kids and take good care of them, he was always there for her. He would also help her with house chores and garden

work whenever he can, and he enjoyed it. Cooking is his favorite hobby and he enjoys making delicious dinner or doing BBQ for his family.

As a father, he means the world to his kids. He has been there for them since day one. When they were babies, he would do everything for them, feed them, dress them, change their diapers and care for them. He loved his kids and wanted to be involved in their lives. He was their friend more than their father. They love talking with him, sharing with him their secrets, and joining him in any activity he does. Alaa would always support them, encourage them to become a better version of themselves, and always instills in them good manners.

Growing up, Alaa has been like a father to me. I have known him since I was 10 years old and I have always looked up to him. His intellect, wisdom and his ingenuity are what I admired about him. He has always supported me in many of my life decisions. And when I fail, he would always encourage me to never give up and to try again. I learned from him the importance to have high aspirations, and he would encourage me to pursue them when no one else would. I learned from him to work hard, be good to people and never stop trying. I feel grateful and very lucky to have wonderful and supportive people like him and my sister in my life."

2. A Prison Sentence Is Not Proportionate to the Nature and Circumstances of the Offense in Light of the COVID-19 Pandemic, in Light of Mr. Garada's Immigration Status and Health Conditions

Any sentence of incarceration in this case would result in Mr. Garada being detained, and possibly deported, from the country he has lived in for 40 years.  He would face permanent separation from his wife and two children and the rest of his family who live here.  And because of his serious health conditions, he would be at risk of developing serious illness both in a BOP facility—and later in an ICE facility—due to the COVID-19 pandemic.

a. **If He Is Sentenced to Prison, Mr. Garada Will Next Be Detained in an ICE Facility—Where COVID-19 Is Rampant—and Placed in Deportation Proceedings As Soon as He's Completed the Sentence**

If the defendant is given a custodial sentence, the defendant must be detained for the duration of the immigration proceedings, without the possibility of a bond.[5]  Given that it could

---

[5] The Supreme Court recently held in a 5-4 decision that detention, without the possibility of release for the duration of the immigration proceeding, is required for any alien given a custodial criminal sentence. *Nielsen v. Preap*, 139 S. Ct. 954, 959, 203 L. Ed. 2d 333 (2019) (holding that such aliens "must be detained without a bond hearing until the question of their removal is

easily take over a year to resolve the immigration case, Mr. Garada will be at a grave risk within an ICE detention facility where the overwhelming majority of inmates have fallen victim to the COVID-19 virus.

Mr. Garada would spend a significant period of time in ICE detention. As explained in a recent Supreme Court dissent, the wait times are long. As Justice Breyer noted in *Jennings v. Rodriguez*, 138 S. Ct. 830, 860, 200 L. Ed. 2d 122 (2018), "[t]he record shows that . . . the Government detained one noncitizen for nearly four years *after* he had finished serving a criminal sentence, and the Government detained other members of this class for 608 days, 561 days, 446 days, 438 days, 387 days, and 305 days—all before they won their cases and received relief from removal. *Id.,* at 92, 213–220." And this only captures the period of time while his case is pending in immigration courts. If there were an adverse result, and Mr. Garada was not awarded any relief, he would spend an additional period of time pending a deportation, which is complicated by the fact that there is not a citizen of anywhere. He could be subject to an additional period of custody of no less than 6 months, and possibly additional years before he is released.

Immigration detention centers have performed far worse than the BOP during the pandemic. In the nearby Virginia detention center, conditions became so dangerous that Judge Brinkema issued an order barring further transfers to the facility. *Santos Garcia et al v. Wolf et. Al.*, 1:20 cv 821, ECF. Doc. 44. Over 90% of inmates contracted the virus, resulting in fatalities,

---

resolved."). *See also Matter of West*, 22 I&N Dec. 1405 (BIA 2000) (where person was sentence to probation, he was not subject to mandatory detention because he was not released from the physical custody of the state). *Hosh v. Lucero*, 680 F.3d 375, 381 (4th Cir. 2012) ("we agree that Congress's command to the Attorney General to detain criminal aliens 'when ... released' from other custody.").

and Judge Brinkema referred to facility management as a "bureaucratic circus."[6]   The complaintdetails the parade of horrors that can be expected for the unfortunate, medically-vulnerable inmates placed into ICE custody at present.

Problems persist and are serious throughout the ICE detention system.  In a report released on January 12, researchers found that immigrants in ICE custody were denied access to even "the most basic Covid-19 prevention measures, such as soap for hand-washing, and were retaliated against for raising safety concerns" while the pandemic spread through numerous detention facilities throughout 2020.[7]  The report concludes that ICE created "unacceptable health risks and violated constitutional and human rights during the pandemic." As of May 31, 2020, ICE reported that more than 50% of those in ICE custody tested positive.[8]

There are numerous more specific examples.  To name just a few, in Texas, individuals were 15 times more like to have COVID-19.[9]  In Georgia, medically vulnerable immigrants were subject to excessive force by guards in retaliation for requesting medical treatment.[10]In Minnesota, authorities habitually denied people for COVID tests (even when symptoms like chest pains and coughs are present), and threaten indefinite isolation and punishment if detainees are sick.[11] A January report from the Detention Watch Network, researchers found that counties containing ICE facilities "reported COVID-19 cases earlier, experienced faster spread of the virus, tended to have

---

[6]                                   https://apnews.com/article/virus-outbreak-immigration-virginia-a16abc4496578f9f8ce069ddcf309231;   https://apnews.com/article/virus-outbreak-virginia-immigration-richmond-courts-62664d8b0c9e44ba786fcd065b0f42dd
[7] Praying for Hand Soap and Masks - Physicians for Human Rights (phr.org)
[8] ICE, Detention Management, https://www.ice.gov/detention-management#wcm-survey-target-id (accessed Aug. 18, 2020).
[9] People In Texas ICE Detention Centers Are 15 Times More Likely To Have COVID-19 | KERA News
[10] Guards Use Force on Immigrants Asking for Medical Help (theintercept.com)
[11] Immigrant detainees denied COVID-19 tests in Minnesota jail. (sahanjournal.com)

worse outbreaks, and had a higher likelihood for a health care emergency".[12] And in a study released on January 21, researchers found that deaths among detained immigrants in ICE custody "increased sevenfold since April 2018, despite far fewer people being in custody." Released by a team from the University of Southern California, the study attributes the rising death rate to a multitude of factors, including rampant spread of Covid-19, high rates of suicide, and substandard medical care offered in ICE facilities.[13]

It is also very troubling that once an individual becomes subject to mandatory detention, the Court is circumscribed in its ability to help in the event of another outbreak of the virus or an outbreak of a mutated virus in the coming months or years. Although the Court can release an individual from BOP detention pursuant to compassionate release, it does not have authority over ICE. The case of Chavez Alvarez is one such illustration. He was released by a federal Court from BOP due to his "chronic illnesses," but then was arrested by ICE, and died two months later in an ICE detention facility.[14]

### b.       The BOP Has Not Complied with the CDC Guidelines

Dr. Kam writes that "[p]lacement of Mr. Garada in any institutions where the CDC guidelines are not strictly followed would seriously jeopardize his health." Dr. Kam Letter. At this point, it is difficult to imagine a clearer example of such an institution than a prison.

BOP reported cases show an infection rate that is nearly five times the rate of the general U.S. population.[15] Over forty-six thousand inmates have tested positive for COVID-19, and more

---

[12] ICE detention facility worsened El Paso's COVID-19 outbreak, new study says | KTSM 9 News
[13] Deaths among ICE detainees driven by COVID, substandard medical care (usc.edu)
[14] A Judge Ordered Him Released From Prison Due To COVID-19 Concerns. He Died Of The Disease Two Months Later In ICE Custody. (buzzfeednews.com)
[15] BOP, *Covid-19 Cases*, www.bop.gov/coronavirus (last updated Aug. 21, 2020). There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to*

than two hundred have died.[16]  Below are two charts showing the rapid spread of the coronavirus in BOP and the rates of infection in BOP as compared to the United States, China, and Italy:[17]



---

*EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[16] https://www.bop.gov/coronavirus/ (last accessed Mar. 30, 2021).

[17] Federal Defenders of New York, https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.10.6.2020.pdf (last updated Oct. 6, 2020).



Whether Mr. Garada is incarcerated in a facility where COVID-19 already exists—the most likely outcome, based on BOP reports—or in a facility where it later appears,[18] it will be virtually impossible to protect him from catching the disease.  He will not be able to self-isolate or practice careful hygiene; he will be forced to share space and amenities with other individuals.  And if Mr. Garada does contract COVID-19, the consequences, as outlined above, are dire.

Although BOP has begun vaccinating populations, these efforts are moving slowly. Equally alarmingly, reports surfaced just last week that many BOP staff are refusing to take the vaccine.[19]   And even after they're vaccinated, inmates are still at risk for reinfection and even death. At least one BOP inmate died after receiving it.[20]   Moreover, it is unclear whether and to

---

[18] With the lack of adequate testing, there is simply no way to know whether COVID-19 exists in an area until people are already sick.  *See* Michael Balsamo*, Over 70% of Tested Inmates in Federal Prisons Have COVID-19*, AP (Apr. 29, 2020), available at https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

[19] Nicole Lewis and Michael Sisak, *'Hello No': Correctional Officers Are Declining the Coronavirus Vaccine en Masse* (Mar. 15, 2021) https://www.themarshallproject.org/2021/03/15/hell-no-correctional-officers-are-declining-the-coronavirus-vaccine-en-masse?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20210315-2391 (last accessed Mar. 17, 2021).

[20] Noah Goldberg, *First Inmate to Die of COVID at Brooklyn Federal Jail Was Vaccinated Days Before Testing Positive for Virus*, New York Daily News (Feb. 8, 2021),

what extent the vaccine may immunize against recently emergent covid-19 variants. *See* Benjamin Barsky et al., *Vaccination Plus Decarceration—Stopping Covid-19 in Jails and Prisons*, New England Journal of Medicine (Mar. 3, 2021), https://www.nejm.org/doi/full/10.1056/NEJMp2100609.

For these and other reasons, medical experts have continued to warn that any measures that BOP is taking to comply with CDC guidelines—including vaccinations—must be coupled with continued decarceration, especially in light of emerging covid-19 variants.[21]  *See id.*; *see also United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released.").

Numerous courts have recognized that the promises of covid-19 vaccines and herd immunity do not diminish the very real danger that the disease still presents, and have granted compassionate release to inmates accordingly. *See United States v. Tran,* No. CR 95-00151 JAO-05, 2021 WL 329203, at *7 (D. Haw. Feb. 1, 2021). ("Based on the Government's own statistics,

---

https://www.nydailynews.com/new-york/ny-edwin-segarra-inmate-mdc-brooklyn-covid19-dead-vaccinated-20210208-ovtvqfmwfzcd7drjoyq6zqluyq-story.html.

[21] The government states that, at the moment, BOP has reported zero inmates testing positive at Cumberland, and six staff.  Opp. at 20.  But "[z]ero confirmed cases is not the same thing as zero COVID-19 cases."  *See United States v. Feucht*, Case No. 11-cr-60025, Dkt. No. 53 (S.D. Fla. May 28, 2020); *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, **2-4 (D. Nev. Apr. 17, 2020) (granting compassionate release to defendant Atkinson, notwithstanding that FCP Atwater where he was housed had seen no cases of covid-19 because the realities of prison life make it impossible for medically vulnerable inmates like Mr. Atkinson to follow CDC guidelines to protect themselves in the face of covid-19); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no reported covid-19 cases at the facility, because he could not adequately protect himself in line with CDC guideline); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020).

less than five percent of the total inmate population has received any of the vaccine.”)**;** *United States v. White*, No. 3:17-CR-00104-2, 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (“In fact, just this month variants to the SARS-CoV-2 strain were identified that may (or may not) allow the virus to spread more quickly, lead to ‘more or sever illness,’ and ‘evade vaccine-induced immunity[.]’” (quoting https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emergin g-variants.html); *United States v. Boddie*, 98-cr-00038JMSMJD, 2021 WL 230108, at *1 (S.D. Ind. Jan. 22, 2021); *United States v. Bass*, 97-cr-80235-1, 2021 WL 228904, at *3 (E.D. Mich. Jan. 22, 2021); *United States v. Frost*, 16-cr-0582, 2021 WL 229665, at *6 (D. Md. Jan. 22, 2021); *United States v. Ramirez*, 18-cr-20676, 2021 WL 168594, at *4 (E.D. Mich. Jan. 19, 2021); *United States v. Hargrove*, No. 3:18-cr-0022-2, 2021 WL 170836, at *7 (D. Conn. Jan. 19, 2021); *see also* No. 3:17-CR-00104-2, 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (noting new variants evading vaccine-induced immunity); *US v. Ramirez*, No. 18-CR-102, 2021 WL 254409, at *2 (E.D. Wis. Jan. 26, 2021) (granting compassionate release despite BOP vaccination campaign being underway).

### c.      *Heart Disease Is a Major Known Risk Factor for Covid-19*

Those suffering from heart conditions “really are at high risk of developing complications” as a result of COVID-19.[22] “When the coronavirus enters your body and gets down to your lungs, what it does is stop the lungs effectively passing oxygen through into the blood, and so the heart has to work harder to pump that blood, which has less oxygen in it,” through the body, and if there

---

[22] *See* Centers for Disease Control and Prevention, “People with Certain Medical Conditions,” https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Aug. 14, 2020); Emmanuel Ocbazghi, *How COVID-19 Affects People with Diabetes, Cancer, and Other Conditions*, Bus. Insider (Apr. 2, 2020), https://www.businessinsider.com/how-covid-19-affects-conditionsdiabetes-asthma-cancer-underlying-copd-2020-3 (“Ocbazghi, *How COVID-19 Affects People*”).

is "an underlying heart condition, that will put excess strain on [the] heart and lead to further complications."[23]  When infected with COVID-19, "the lungs turn grey all over as the infection works from the outer air sacs of the lungs. Fluid, pus, and debris build."[24]  As a result, covid-19 patients develop Acute Respiratory Distress Syndrome [ARDS]."[25]  "There is no cure for ARDS. Ventilators buy time as the body tries to heal but the lack of oxygen and the assault on the body put a tremendous strain on the heart.  Many patients develop heart failure."[26]

And patients whose hearts were weak to begin with are at greater risk.  "Someone with an underlying heart issue also might have a less robust immune system" and when they catch a virus "it's likely to stick around and cause complications."[27]  It's also more likely to be fatal: "Of the first 44,672 diagnosed COVID-19 cases in China, patients with cardiovascular diseases," including previous heart attacks, "had the highest fatality rate, at 10.5%."[28]

Again, Mr. Garada is fifty-nine years old.  He had open-heart surgery in December 2016, after he had suffered a heart attack.[29]  *See* PSR ¶ 126; Encl. 1 (Dr. Laurance Kam Letter) ("Dr. Kam Letter"); Encl. 2 (Dr. Kam Records).  He has to see his cardiologist at least every six months to monitor his condition.  His cardiologist has diagnosed him with hyperlipidemia and coronary atherosclerosis (also known as coronary artery disease).  He is on numerous medications to treat both conditions and reduce his risk of a future heart attack or stroke.  His cardiologist, Dr.

---

[23] Ocbazghi, *How COVID-19 Affects People*.
[24] Katharin Czink, et al., *Why COVID-19 Is So Dangerous for the Heart*, WGNTV (Mar. 30, 2020), https://wgntv.com/news/medical-watch/why-covid-19-is-so-dangerous-for-the-heart/.
[25] *Id.*
[26] *What Heart Patients Should Know about Coronoavirus*, Am. Heart Ass'n News (Mar. 24, 2020), https://www.heart.org/en/news/2020/02/27/what-heart-patients-should-know-about-coronavirus.
[27] *Id.*
[28] *Id.*
[29] He was hospitalized briefly again after the surgery in January 2017 after experiencing blurred vision and dizziness.

Lawrance Kam, has provided a letter confirming Mr. Garada's medical condition and stating that "[a]ny placement of Mr. Garada in any institutions where the CDC [Centers for Disease Control and Prevention] guidelines are not strictly followed would seriously jeopardize his health."  Dr. Kam Letter.

Outside of prison, he is receiving, and is able to manage—with help from his family—the frequent medical care that he needs to treat this condition.  His doctor, however, has stressed that, in the COVID-19 pandemic, a crucial part of that care is being able to maintain social distancing and wear a face mask whenever he is outside.  *See* Dr. Kam Letter.  If he is sent to prison, not only would he lose access to the medical care he needs to treat his heart condition, he would lose the control over his social settings that he needs to ensure he complies with the CDC's guidelines.  And because of his heart condition, he would be in great danger of becoming seriously ill or even dying as a result of exposure to COVID-19.

As a man in his late 50s with a history of heart disease—including one open-heart surgery—Mr. Garada is at especially high risk of serious illness and death due to the COVID-19 pandemic.  Any time in prison would significantly increase that risk, and this is doubly true given that he will be subject to mandatory immigration detention if ordered into BOP custody.  These history and characteristics—as well as the nature of the offense, and the need to avoid unwarranted sentencing disparities, given the number of prisoners with heart disease who have been released as a result of the COVID-19 pandemic—present a strong cause for a varying downward from the Guidelines.  Indeed, if Mr. Garada were to receive prison time, the parties would only end up back in Court shortly thereafter on the issue of Mr. Garada's compassionate release.

Dr. Kam—Mr. Garada's doctor—confirms that the risk to Mr. Garada is especially high: "[b]ecause of [Mr. Garada's] heart disease, he is at increased risk for adverse outcome should he

contract COVID-19." Dr. Kam Letter. The overwhelming research confirms that, for Mr. Garada, the adverse outcomes include serious health complications and even death.

> ### d. This Court and others have granted compassionate release to numerous individuals with similar or less serious conditions

Courts around the country—including in the Eastern District of Virginia—have recognized the especially grave risks COVID-19 poses to people with heart disease and ordered compassionate release for inmates whose age and health issues are similar to Mr. Garada's. *See United States v. Avila*, No. 2:14-CR-108, 2021 WL 1082481, at *1 (E.D. Va. Mar. 18, 2021) (granting compassionate release 56-year-old inmate with coronary heart disease and hyperlipidemia); *Herrera v. United States*, No. 2:13CR122, 2021 WL 124520, at *4 (E.D. Va. Jan. 13, 2021) (granting compassionate release to individual who had hyperlipidemia and would be placed in ICE custody upon completion of his sentence, noting, "Although Petitioner's original sentence was lawfully imposed in accordance with the § 3553(a) factors, serious illness and the potential for an accelerated death was decidedly *not* among the reasons for it."); *United States v. Poulios*, 2:09-CR-109, 2020 WL 1922775, at *3 (E.D. Va. Apr. 21, 2020) (granting release to petitioner with robbery conviction who had had a heart attack and two subsequent surgeries); *Woodard v. United States*, 2:12-CR-105, 2020 WL 3528413, at *2 (E.D. Va. June 26, 2020) (granting release to petitioner who "has a history of heart problems"); *United States v. Lee*, 1:95-CR-58 (LMB), 2020 WL 3422772, at *2 (E.D. Va. June 22, 2020) (granting release to petitioner with hyperlipidemia and a family history of heart disease); *Casey v. United States*, 4:18-CR-4, 2020 WL 2297184, at *3 (E.D. Va. May 6, 2020) (granting release to petitioner with history of heart problems, including heart attack); *United States v. Sedge*, 16-CR-537(KAM), 2020 WL 2475071, at *3 (E.D.N.Y. May 13, 2020) (granting compassionate release for inmate who with history of heart disease); *Cotton v. United States*, CR 16-20222-8, 2020 WL 3488752, at *3 (E.D. Mich. June 26, 2020) (granting

compassionate   release   to   petitioner   with   hyperlipidemia)   ("[T]he   CDC   has recognized hyperlipidemia, along with other chronic diseases, as prevalent in patients hospitalized due to COVID-19.") (citing *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019*, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm)); *United States v. Jones*, 13-CR-577-2, 2020 WL 3892960, at *3 (E.D. Pa. July 9, 2020) (granting release to 48-year-old inmate with hyperlipidemia) (noting that, according to statistics released by New York state government, "the third leading comorbidity [of covid-19] was hyperlipidemia (5,186 fatalities)" (citing   https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n).[30]

## CONCLUSION

Wherefore, for the foregoing reasons and any other that may appear to the Court, we respectfully request that the Court impose the agreed sentencing recommendation of probation with 18 months home confinement, with any appropriate other conditions.

---

[30] As of August 23, 2020, hyperlipidemia remains the third leading comorbidity for individuals who died of covid-19; coronary artery disease is the fifth.

Respectfully submitted,

ALAA GARADA
By Counsel

_____/s/_____
Cary Citronberg
John Zwerling
ZWERLING/CITRONBERG, P.L.LC.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
cary@zwerling.com


_____/s/_____
Jonathan Jeffress (#42884)
Amelia J. Schmidt (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: aschmidt@kaiserdillon.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of April, 2021, I filed the foregoing by ECF, which shall serve notice of this filing upon all parties.

_____/s/_____
Cary Citronberg
John Zwerling
ZWERLING/CITRONBERG, P.L.LC.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
cary@zwerling.com